

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JAMES NELSON, on behalf of himself and a class of persons similarly situated, | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) ) ) |
| BP CORPORATION NORTH AMERICA, INC., MARVIN DAMSMA, BYRON GROTE, COLIN MALTBY, JAMES NEMETH, ANTHONY NOCCHIERO, DONALD PACKHAM, IAN SPRINGETT, and the BP EMPLOYEE SAVINGS PLAN, | ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) |

**04C 7660**

MAGISTRATE SIDNEY I. SCHENKIER

## CLASS ACTION COMPLAINT

For his Class Action Complaint seeking relief against Defendants, BP Corporation North America, Inc. ("BP") and Marvin Damsma, Byron Grote, Colin Maltby, James Nemeth, Anthony Nocchiero, Donald Packham, and Ian Springett, and joining the BP Employee Savings Plan for relief purposes, Plaintiff alleges as follows:

## I.     NATURE OF THE ACTION

1.      This is a civil enforcement action brought pursuant to Section 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132. It concerns the Money Market Fund core investment option of the BP Employee Savings Plan (the "Plan"), a 401(k)-type retirement plan established by BP Corporation North America, Inc., and its predecessors.

2.      BP hired UBS Global Asset Management (Americas), Inc., f/k/a Brinson Partners, Inc., to act as the Investment Manager of the Money Market Fund option, and it appointed the

Investment Committee to monitor Brinson to ensure, among other things, that participant contributions to the Money Market Fund option were invested properly. In breach of their fiduciary duties, however, Defendants directed or allowed Brinson to imprudently invest the participants' retirement savings in a large amount of risky debt, including debt of Enron Corporation ("Enron"), which should not have been purchased, should not have been retained, and which became essentially worthless after Enron's collapse in late 2001, resulting in losses to the Plan.

3.      Plaintiff, James Nelson, was an employee of BP and was and is a participant in the Plan. He alleges that Defendants were fiduciaries of the Plan and that they breached their fiduciary duties to him, the other participants and beneficiaries of the Plan, and the Plan in violation of ERISA Section 409, 29 U.S.C. § 1109. He also alleges that Defendants are liable for losses to the Plan resulting from Brinson's breaches of fiduciary duty under the co-fiduciary liability provisions of ERISA Section 405(a), 29 U.S.C. § 1105(a).

4.      Because his claims apply to the participants and beneficiaries of the Plan as a whole, and because ERISA authorizes a participant such as Mr. Nelson to sue on behalf of the Plan and obtain plan-wide relief for breaches of fiduciary duty, he brings this action as a class action on behalf of himself and all the participants and beneficiaries of the Plan during the relevant period or "derivatively" on behalf of the Plan, which is a defendant for purposes of relief only.

## II.     JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA Section 502(e)(1), 29 U.S.C. § 1132(e)(1), and personal jurisdiction over the Defendants.

6.    Venue is properly laid in this district pursuant to ERISA Section 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plan was administered in this district, some or all of the fiduciary breaches for which relief is sought occurred in this district, Plaintiff resides in this District, and some Defendants reside in or are citizens of this district.

## III.    THE PARTIES

7.    The Plan is an "employee pension benefit plan" within the meaning of ERISA Section 3(2)(A), 29 U.S.C. § 1002(2)(A). It is an "eligible individual account plan" within the meaning of ERISA Section 407(d)(3), 29 U.S.C. § 1107(d)(3), and a "qualified cash or deferred arrangement" within the meaning of I.R.C. Section 401(k), 26 U.S.C. § 401(k). The Plan is a party to this action only nominally for relief purposes. Pursuant to ERISA, the relief requested in this action is, in whole or part, for the benefit of the Plan.

8.    Plaintiff is a resident of Naperville, Illinois. For many years he worked for BP, and he was and is a participant in the Plan. He formerly invested in the Plan's Money Market Fund option at the time in question.

9.    Brinson is a global investment advisory firm headquartered in Chicago. It was at all relevant times the Investment Manager for the Plan's Money Market Fund investment option. Brinson is not a defendant in this action, but it is a defendant in a "related" action (using "related" in its colloquial sense only, without prejudicing any "relatedness" motion that may be brought in the future) pending in the United States District Court for the Northern District of Illinois, *Nelson v. Brinson Partners, Inc.*, Case No. 03 CV 6446, (Kocoras, J.).

10.    Defendant BP is an Indiana corporation. It was the Plan sponsor and a named fiduciary of the Plan and it exercised discretionary control and authority respecting the Plan, the Plan's assets, and Plan administration.

3

11.     Defendant Marvin Damsma was a member of the Investment Committee during 2001, which had the responsibility to, among other things, (1) select, direct, monitor, and, if appropriate, terminate Brinson as Investment Manager of the Money Market Fund option and (2) to develop investment strategies and policies for the Plan. He was also the Director of BP's Trust Investments Group during 2001 with stated responsibility to, among other things, (1) exercise oversight and monitoring of the Money Market Fund option, (2) establish and maintain the investment manager agreement with Brinson, (3) engage in day-to-day interactions with Brinson, (4) periodically review the performance of the Money Market Fund option, and (5) take any other necessary and permissible actions.

12.     Defendant Donald Packham was a member of the Investment Committee during 2001. Mr. Packham was also Senior Vice President, Human Resources, of BP and was the Plan Administrator from June 2001 until he retired in May 2004.

13.     Defendants Byron Grote, Colin Maltby, James Nemeth, Anthony Nocchiero, and Ian Springett were members of the Investment Committee during 2001.

## IV.    **FIDUCIARY STATUS**

14.     ERISA requires every plan to provide for one or more *named fiduciaries*, who will have "authority to control and manage the operation and administration of the plan." ERISA Section 402(a)(1), 29 U.S.C. § 1102(a)(1).

15.     ERISA also treats as *functional fiduciaries* not only persons explicitly named as fiduciaries under Section 402(a)(1), but also persons who act or function as fiduciaries. ERISA Section 3(21)(A)(i), 29 U.S.C. § 1002 (21)(A)(i), makes a person a fiduciary

> to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee

4

or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan. . . .

16.     During the Class Period, and before, Brinson had discretionary authority respecting Plan assets invested in the Money Market Fund option. Also, in its Investment Manager Agreement ("IMA") with BP, Brinson acknowledged that it was "a fiduciary, as defined in ERISA, with respect to said plan [meaning the Plan], trust [meaning the BP Master Trust for Employee Savings Plans], and investment account [meaning the account within the BP Master Trust designated for contributions to the Money Market Fund investment option]."

17.     Defendants BP, Marvin Damsma, Byron Grote, Colin Maltby, James Nemeth, Anthony Nocchiero, Donald Packham, and Ian Springett were Plan fiduciaries with respect to the facts alleged herein by virtue of their positions and responsibilities alleged in Paragraphs 10 through 13 and because they were functional fiduciaries under ERISA Section 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

## V.     APPROPRIATENESS OF CLASS ACTION

18.     Because Plaintiff is suing on behalf of the Plan, as authorized by ERISA, Plaintiff does not believe that class certification is necessary in order to obtain full relief. To the extent necessary, or alternatively, Plaintiff brings this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of himself and a class of all persons similarly situated (the "Class"). The Class consists of all persons who were participants in or beneficiaries of the Plan, excluding the Defendants, on December 4, 2001 (the "Class Period"), and who had funds in the Plan's Money Market Fund option at that time.

19.     Plaintiff meets the prerequisites to bring this action on behalf of the Class for the following reasons:

a. **Numerosity.** The Class consists of several thousand individuals and is so numerous that joinder of all members as individual plaintiffs is impracticable.

b. **Commonality.** There are questions of law and fact common to the Class.

c. **Typicality.** The Plaintiff's claims are typical of the claims of the Class.

d. **Adequacy.** Plaintiff will fairly and adequately protect the interests of the Class. He has no interests that are antagonistic to or in conflict with the interests of the Class as a whole, and he has engaged competent counsel, experienced in class actions and complex litigation.

20.     This action is maintainable as a class action for the following independent reasons:

a.     The prosecution of separate actions by the members of the Class would create a risk of inconsistent or varying adjudications with respect to the individual members of the Class, which would establish incompatible standards of conduct for Defendants. Rule 23(b)(1)(A), Fed. R. Civ. P.

b.     The prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests. Rule 23(b)(1)(B), Fed. R. Civ. P.

c.     The Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole. Rule 23(b)(2), Fed. R. Civ. P.

d.     Questions of law and fact common to members of the Class predominate over any questions affecting only individual members, and the class action is superior to other

available methods for the fair and efficient adjudication of the controversy. Rule 23(b)(3), Fed. R. Civ. P.

## VI.    FACTUAL BACKGROUND TO BREACHES OF FIDUCIARY DUTY

21.    The Defendants offered Plan participants 20 different core investment options in which they could invest their retirement savings, but there was only one short-term option. It was named the "Money Market Fund," and it was uniformly represented as the safest investment option in the Plan. For example, the "Risk Meters" in the Savings: Investment Options brochure distributed to participants in 2000 and 2001 rank the Money Market Fund option as safer than Fidelity's regulated money market mutual fund (which would have been prohibited by federal law from purchasing the Enron securities that eventually gave rise to this case) and even safer than a U.S. savings bond fund. The Money Market Fund was also the default core investment option; if a participant did not elect an option or died, the Defendants invested his or her contributions in the Money Market Fund option automatically. The Money Market Fund option emphasized safety of principal and specified as a benchmark the 30-day U.S. Treasury bill. That benchmark is consistent with and conveys the utmost safety and the lowest possible risk and was consistent with how Defendants and Brinson knew the Money Market Fund option was described to Plan participants.

22.    But the Money Market Fund option, as managed and invested, was not nearly as safe as it was supposed to be. Pursuant to the IMA, participant contributions to the Money Market Fund option were invested in a fund in the Brinson Trust Company Collective Investment Trust for Pension and Profit Sharing Trusts named the U.S. Cash Management for Directed Trusts Fund ("Directed Trusts Fund"). Although the IMA permitted Brinson to diversify the assets of the Directed Trusts Fund across five broad categories of investments

(including, ironically, shares in money market mutual funds), Brinson and the Defendants chose to invest all of the Directed Trusts Fund in units of Brinson's U.S. Cash Management Fund ("Cash Management Fund").

23.     The Cash Management Fund invested in instruments that were much riskier than those typically associated with a money market fund. For example, the Cash Management Fund invested heavily in commercial paper rated A2/P2 as well as instruments not eligible for a money market mutual fund due to ratings deficiencies, such as securities rated A3/P3 and even unrated securities, most notably the Enron loan participations at issue in this case. The aggregate amount of A2/P2, A3/P3, and unrated securities in the Cash Management Fund was not consistent with, and was substantially more aggressive in terms of credit quality than, the 30-day T-bill benchmark and was not consistent with the Money Market Fund option's stated focus on preservation of principal.

24.     Brinson invested the Cash Management Fund in such an aggressive manner in large part because it was trying to boost profits in its securities lending program, which Brinson used to defray the custodial fees it paid to JP Morgan, the custodian of the Collective Investment Trust. Furthermore, it purchased Enron loan participations during 2001, in part, in order to curry favor with Enron, whose benefit plans Brinson was courting as a potential client.

25.     Moreover, Brinson purchased low-rated or unrated debt for the Cash Management Fund without proper and prudent credit analysis. For example, like the analysts at its parent company, UBS AG, Brinson's credit analyst had doubts about Enron's creditworthiness, but he failed to communicate or act on those doubts. He was later penalized for allowing the Enron securities that later defaulted to be purchased. And, although after the default Brinson belatedly implemented additional "rating screens" to "remove certain portfolio investments that could

suffer . . . rapid devaluation," Brinson, even though required to do so by its own internal policies, did not implement such procedures when it could have prevented the loss to the BP Plan.

26.     On October 3, 2001, Brinson purchased for the Cash Management Fund a $3,107,000 Enron bond with a maturity of August 1, 2002, (the "Enron Bond") at a time when Brinson's debt was rated A2/P2, despite Brinson's own prohibitions against purchasing securities for the Cash Management Fund with a maturity of more than 91 days if rated below A1/P1.

27.     On October 11, 2001, Brinson purchased from Toronto-Dominion Bank a $55 million unsecured Enron loan participation (the "Enron LPC") that was due to mature November 29, 2001, at an interest rate of 2.9% per annum. Brinson, which was the "Participant" in the Enron LPC, was not authorized to enter into loan participations with Toronto-Dominion on behalf of the Cash Management Fund and its subsequent transfer of the Enron LPC to the Cash Management Fund constituted a prohibited transaction under ERISA Section 406, a breach of fiduciary duty, and a violation of the Declaration of Trust for the Collective Investment Trust.

28.     Loan participations are far more complex securities than the commercial paper in which money markets typically invest. Because of that complexity, they are not rated by credit rating agencies, such as Moody's or S&P. They are also illiquid, meaning that there is no secondary market; once one purchases a loan participation, one often has little choice but to hold it to maturity. Moreover, loan participations inherently involve an additional layer of credit risk over the securities money market funds typically purchase because they carry not only the risk that the issuer will default, but also the risk that the seller, here Toronto-Dominion, will default.

29.     Brinson's own policies reflected the risky, non-standard nature of loan participations. Brinson Trust Company Policy Manual, Policy No. 512C, required that loan

participations "must have signed documentation approved by the legal staff of the Fund's advisor," if Brinson acquired such instruments for the Cash Management Fund. Brinson did not follow that requirement before purchasing and holding the Enron LPC.

30.     Late on December 3, 2001, Brinson's actions caught up with it and Brinson client relationship manager, Charles Service, contacted John Ruey of BP's Trust Investments group to report "some bad news." The bad news was that the $55 million Enron LPC and the $3,107,000 Enron Bond had defaulted, with a loss to the Money Market Fund option of approximately 2%, or $20 million. Internally, BP regarded this as a "significant" change in the Money Market Fund value, with the consequence that "any parties in the BP Savings Plan Money Market Fund on Monday morning December 3, would have experienced the Brinson Partners 2% fund loss on a pro rata basis."

31.     Although the Money Market Fund option was supposed to be priced daily, the November 29, 2001, default was not reported to BP until late on December 3, 2001. Not only does that delay evidence the improper nature of Brinson's stewardship, but it means that all persons who withdrew their funds from the Money Market Fund from November 29, 2001, to December 3, 2001, were overpaid to the detriment of those who, like plaintiff, remained in the Money Market Fund on December 3, 2001. Indeed, it appears that the Money Market Fund had been overvalued by Brinson since sometime in October 2001 because the Enron Bond and the Enron LPC were carried at full value since purchase, even though their true value was steadily falling in October and November 2001. As a result, everyone who came into the Money Market Fund since that date, including many Class members, overpaid for his or her shares, and everyone who withdrew from the Money Market Fund was overcompensated. This dislocation and waste of Plan assets was a direct result of Brinson's failure to properly price the Money

Market Fund on a daily basis to reflect the progressive decline in the value of the Enron Bond and the Enron LPC.

32.    On or about December 11, 2001, the Plan participants were advised in a letter from Defendant Donald Packham, the Plan Administrator and BP's Senior Vice President, Human Resources, that the Money Market Fund option had experienced "a reduction in value of approximately 2%—.20 per unit—on the Monday, December 3, 2001 closing price due to exposure to debt holdings of Enron." The letter also enclosed a "Statement" from Brinson.

33.    Although it purported to explain to Plan participants what had happened to their retirement savings, the Brinson Statement was largely an effort at self-exculpation. Among other misleading statements in this communication, Brinson stated that the Enron Bond and the Enron LPC were "in compliance with the investment policies of the Fund" when, in fact, they violated many of them, including the requirement that loan participations have documentation signed by the Cash Management Fund's legal advisor, the requirement that Enron be on the Approved Issuer List, the 30-day U.S. Treasury bill benchmark, which is an implied safety standard, the overriding goal of "safety of principal," the restriction that no single issuer represent more than 3% of the Cash Management Fund, and the requirement that securities rated below A1/P1 have a maturity shorter than 91 days.

34.    There was also ample warning prior to Enron's default on November 29, 2001, that Brinson should have sold the Enron Bond and the Enron LPC at a loss rather than holding them until the bitter end. For example, on October 16, 2001, Enron announced its first quarterly loss in four years after taking $1 billion of charges for poorly performing businesses. The SEC investigation was launched on October 22, 2001. Andrew Fastow, now under indictment, resigned as Enron CFO on October 24, 2001. More than a month before Enron's collapse, on

October 25, 2001, the Fitch debt rating service placed Enron on "negative watch" and on November 5, 2001, lowered Enron to F3, keeping it on "negative watch." By October 29, 2001, Enron's stock price had tumbled from a high of almost $90 in January 2001 to close to $15. On October 29, 2001, Moody's put Enron on negative watch and on November 9, 2001, put it in the "non-perform" (*i.e.*, likely to default) category. Standard and Poors did the same.

35.     The Statement also masked the fact that Brinson had been obtaining its supposedly higher returns not by managing both credit risk and maturity, as it was hired to do and as would have been prudent, but almost exclusively by simply purchasing risky lower quality credits. Indeed, at the time of the Enron default, nearly all of the little high-quality A1/P1 paper in the Cash Management Fund was concentrated into the shortest maturity range. Thus, Brinson's own Statement is at odds with the IMA and the Investment Options brochure provided to Plan participants to the effect that "enhanced" yields were obtained through a combination of "active maturity management, credit analysis and security selection."

36.     At no time were participants advised or warned of the riskiness of Brinson's course of action, the imprudent concentration of the Money Market Fund in the lower ranges of securities, or that the Money Market Fund was not nearly as safe as a real money market fund, which is prohibited by law (by regulations promulgated under the Investment Company Act of 1940, most notably 17 C.F.R. § 270.2a-7) from making the type and amount of risky investments that Brinson chose for the Money Market Fund, or that it had failed to take out insurance for such an event as it was required to do by Section 19(b) of the IMA. Moreover, Defendants never checked to make sure Brinson had purchased that insurance.

37.     After the Enron investments defaulted, Defendants conducted an investigation into whether Brinson was liable for the losses to the Plan. The investigation was cursory at best.

Defendants did not adequately consider whether Brinson violated the Plan documents or its internal policies or whether it breached its fiduciary duties under ERISA or engaged in any prohibited transactions.

38.     As a result of their flawed investigation, Defendants decided not to sue Brinson.

39.     Despite their failure to sue Brinson, Defendants belatedly admitted that the name of the Money Market Fund option was misleading given how the funds were actually invested and that many participants were not aware of the risks. They also decided to fire Brinson, hire new Investment Managers, and substantially upgrade the credit quality of the Money Market Fund option.

40.     In late January 2002, Defendants amended the Plan to change the name of the Money Market Fund core investment option to the "Short Term Investments Fund" and to hire State Street and Fidelity as the new Investment Managers. They hired two Investment Managers, rather than one, to diversify the Money Market Fund option in order to minimize the risk of large losses, something they had previously failed to do. The Defendants distributed an amended Investment Options Brochure to Plan participants to inform them of the changes.

41.     After the amendments, participant contributions to the Short Term Investments Fund option were deposited in one of two funds: (1) the State Street Bank and Trust Company Investment Funds for Tax Exempt Retirement Plans—Short-Term Investment Fund or (2) the Fidelity Institutional Money Market: Money Market Portfolio Class I.

42.     The State Street Fund and the Fidelity Institutional Money Market were both much safer than the Cash Management Fund. For example, neither fund could permissibly have purchased the Enron Bond or the Enron LPC.

## VII.   FIDUCIARY DUTIES AND CO-FIDUCIARY LIABILITY

### A.      Fiduciary Duties

43.      ERISA Section 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B), imposes on every plan fiduciary a duty of prudence—that is, a duty to "discharge his duties with respect to a plan . . . with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man, acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims . . . ."

44.      ERISA Section 404(a)(1)(C), 29 U.S.C. § 1104(a)(1)(C), requires a fiduciary to "diversify[] the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so."

45.      ERISA Section 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), imposes on a plan fiduciary a duty of loyalty—that is, a duty to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . for the exclusive purpose of . . . providing benefits to participants and their beneficiaries . . . ."

46.      ERISA Section 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D), requires plan fiduciaries to act "in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with [ERISA]."

47.      A plan fiduciary's duties also include (1) a negative duty not to misinform, (2) an affirmative duty to inform when the fiduciary knows or should know that silence could be harmful to the participants, (3) a duty to convey complete and accurate information regarding facts material to the participants' investment decisions, and (4) a duty to monitor other fiduciaries to whom responsibilities have been delegated.

B.    **Cofiduciary Liability**

48.    ERISA Section 405(a)(1), 29 U.S.C. § 1105(a)(1), makes a fiduciary liable for the breach of another fiduciary "if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach . . . ."

49.    ERISA Section 405(a)(2), 29 U.S.C. § 1105(a)(2), makes a fiduciary liable for the breach of another fiduciary "if, by his failure to comply with section 1104(a)(1) . . . in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach . . . ."

50.    Under ERISA Section 405(a)(3), 29 U.S.C. § 1105(a)(3), a fiduciary is liable for the breach of another "if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach."

VIII.    **BREACHES OF FIDUCIARY DUTY**

51.    Brinson breached its fiduciary duties of prudence, loyalty, to disclose and inform with respect to the Plan's investments, to diversify investments to minimize the risk of large losses, and to act according to Plan documents. Brinson took undue risks, foisted its own Enron losses onto the Plan, failed to follow Plan documents, dealt with Plan assets in its own interest, profited via the securities lending program and otherwise from Plan assets, acted in transactions involving the Plan on behalf of parties whose interests were adverse to those of the Plan, and engaged in other prohibited transactions. Brinson also withheld and concealed material information and misled the participants and beneficiaries about the appropriateness of investing in the Money Market Fund, thereby encouraging participants and beneficiaries of the Plan to continue to make and to maintain substantial investments in the Money Market Fund in the Plan.

Plaintiff, for example, lost some $30,000 as a result of the improper investing course of action pursued by Brinson, not to mention mispricing losses.

52.     The Defendants breached their duties of prudence, to disclose and inform with respect to the Plan's investments, to monitor Brinson, to diversify the Money Market Fund option to minimize the risk of large losses, to act according to Plan documents, including the Investment Options brochure dated March 15, 2000, to take proper steps to ensure that participant contributions to the Money Market Fund option were invested consistently with the descriptions of the Money Market Fund option in the Plan documents distributed to participants, and to pursue actions against Brinson to require Brinson to make good the losses to the Plan.

53.     Each of the Defendants had knowledge of the other's breaches of fiduciary duty and of Brinson's breaches of fiduciary duty and knowingly participated in those breaches. In addition, each of the Defendants' breaches of fiduciary duty, including their failure to monitor Brinson, enabled Brinson to violate its fiduciary duties and engage in prohibited transactions. Finally, each of the Defendants had knowledge of the other's breaches of fiduciary duty and Brinson's breaches of fiduciary duty, but they failed to make reasonable efforts under the circumstances to remedy those breaches. Therefore, each of the Defendants are liable under ERISA Section 405(a), 29 U.S.C. § 1105(a), for the losses to the Plan that resulted from each of the other Defendants' breaches of fiduciary duty and Brinson's breaches of fiduciary duty and prohibited transactions.

## VIII.  CAUSATION

54.     Defendants' fiduciary breaches and Brinson's fiduciary breaches resulted in losses to the Plan, and Plaintiff and the other Class members are entitled to relief.

55.    The Plan also suffered a loss, and Plaintiff and the other Class members were damaged, by Brinson's undisclosed conflict of interest and Defendants' and Brinson's materially deceptive statements, acts, and omissions which Defendants knew or should have known would deceive Plaintiff and the other Class members about the prudence of making and maintaining investments in the Money Market Fund option. Where a breach of fiduciary duty consists of or includes misrepresentations and omissions material to a decision by a reasonable participant that results in harm to the participant, the participant is presumed as a matter of law to have relied upon such misrepresentations and omissions to his or his detriment. Here, Defendants' and Brinson's statements, acts, and omissions constituted misrepresentations and omissions that were material to a reasonable participant's decision whether to invest in the Money Market Fund option. The Plan, Plaintiff, and the other Class members are therefore presumed to have relied to their detriment on Defendants' and Brinson's deceptive statements, acts, and omissions.

IX.    **REMEDIES FOR BREACHES OF FIDUCIARY DUTIES AND PROHIBITED TRANSACTIONS**

56.    ERISA Section 502 (a)(2), 29 U.S.C. § 1132(a)(2) authorizes a plan participant to sue for appropriate relief under Section 409, 29 U.S.C. § 1109. Section 409 requires "[a]ny person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries . . . to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made though use of assets of the plan by the fiduciary . . . ." Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate . . . ."

57.    Plaintiff and the Class are entitled to the following relief:

1)      a monetary payment from the Defendants to the Plan to make good to the Plan the losses to the Plan resulting from the aforesaid breaches of fiduciary duties and prohibited transactions in an amount to be proven at trial, as required by ERISA Section 409(a), 29 U.S.C. § 1109(a);

2)      a monetary payment from the Defendants to the Plan to reimburse the Plan for the attorney fees incurred in this case and in *Nelson v. Brinson Partners, Inc.*, Case No. 03 CV 6446, as a result of Defendants' failure to sue Brinson on behalf of the Plan;

3)      any profits or benefits Defendants or Brinson gained as a result of their breaches of fiduciary duty or prohibited transactions;

2)      injunctive and other appropriate equitable relief, as provided by ERISA Section 502(a)(2) & (3), 29 U.S.C. § 1132(a)(2) & (3);

3)      reasonable attorney fees and expenses as provided by ERISA Section 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law;

4)      taxable costs; and

5)      interest on some or all of these amounts as provided by law.

## X.      NO FRAUD ALLEGED

58.      Notwithstanding anything to the contrary alleged herein, Plaintiff does not allege fraud on the part of Defendants, and this Class Action Complaint is not subject to Rule 9(b), Fed. R. Civ. P. Any allegations that are or may be construed as charging fraud are hereby withdrawn or modified to allege only negligence, lack of care, or other breach of fiduciary duty or prohibited transactions under ERISA.

## XI.   **EXHAUSTION**

59.     Plaintiff is not subject to any exhaustion of Plan claim procedures for a variety of reasons, including that the Plan provides no procedures or provisions applicable to the claims at issue, the claims herein are statutory claims and claims for breach of fiduciary duty, and resort to the claims procedure would be futile. In any event Plaintiff fully exhausted all available procedures.

## XII.  **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff and the Class and/or the Plan pray for judgment against BP and the Investment Committee for monetary relief, injunctive, remedial, and other equitable relief, attorney fees, expenses, costs, and interest, and any other relief permissible under the circumstances and the Federal Rules of Civil Procedure that the Court deems just. The Plan should be required to properly allocate any funds recovered to appropriate participants.

Respectfully submitted,

One of the Attorneys for Plaintiff

Shawn M. Collins, Esq.                    Charles R. Watkins, Esq.
David J. Fish, Esq.                       John R. Wylie, Esq.
The Collins Law Firm                      Matthew T. Heffner, Esq.
1770 North Park Street, Suite 200         Glenn L. Hara, Esq.
Naperville, Illinois 60563                Susman & Watkins
T: (630) 527-1595                         Two First National Plaza, Suite 600
                                          Chicago, Illinois 60603
                                          T: (312) 346-3466

DATED: November **24**, 2004



# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS



DOCKETED

NOV 2 9 2004

# Civil Cover Sheet

This automated JS-44 conforms generally to the manual JS-44 approved by the Judicial Conference of the United States in September 1974. The data is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. The information contained herein neither replaces nor supplements the filing and service of pleadings or other papers as required by law. This form is authorized for use only in the Northern District of Illinois.

**Plaintiff(s):** James Nelson, on behalf of himself and a class of persons similarly situated,

**Defendant(s):** BP Corporation North America, Inc., Marvin Damsma, Byron Grote, Colin Maltby, James Nemeth, Anthony Nocchiero, Donald Packham, Ian Springett, and the BP Employee Savings Plan,

County of Residence: DuPage County

County of Residence: DuPage County

Plaintiff's Atty: Charles R. Watkins
Susman & Watkins
Two First National Plaza, Suite 600, Chicago IL 60603
(312) 346-3466

Defendant's Atty:

# 04C 7660

II. Basis of Jurisdiction: **3. Federal Question (U.S. not a party)**

III. Citizenship of Principal Parties (Diversity Cases Only)
    Plaintiff:- **N/A**
    Defendant:- **N/A**

JUDGE NORDBERG

MAGISTRATE SIDNEY I. SCHENKIER

IV. Origin : **1. Original Proceeding**

V. Nature of Suit: **791 E.R.I.S.A**

VI.Cause of Action: **29 U.S.C. Sec. 1001, et seq. Breach of fiduciary duty.**

VII. Requested in Complaint
    Class Action: **Yes**
    Dollar Demand:
    Jury Demand:

FILED-SDA
2004 NOV 24  PM 2:52
CLERK
U.S. DISTRICT COURT

VIII. This case **IS NOT** a refiling of a previously dismissed case.

Signature:

Date: 11-24-04

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

DOCKETED
NOV 2 9 2004

the Matter of

mes Nelson, on behalf of himself and a class of persons
milarly situated,

P Corporation North America, Inc., et al.

Case Number: 04 C 7660

PPEARANCES ARE HEREBY FILED BY THE UNDERSIGNED AS ATTORNEY(S) FOR:

mes Nelson and the Class

JUDGE NORDBERG

MAGISTRATE SIDNEY I. SCHENKIER

| (A) | (B) |
|---|---|
| SIGNATURE | SIGNATURE |
| NAME Charles R. Watkins | NAME Glenn L. Hara |
| FIRM Susman & Watkins | FIRM Susman & Watkins |
| STREET ADDRESS Two First National Plaza, Suite 600 | STREET ADDRESS Two First National Plaza, Suite 600 |
| CITY/STATE/ZIP Chicago, Illinois 60603 | CITY/STATE/ZIP Chicago, Illinois 60603 |
| TELEPHONE NUMBER (312) 346-3466 / FAX NUMBER (312) 346-2829 | TELEPHONE NUMBER (312) 346-3466 / FAX NUMBER (312) 346-2829 |
| E-MAIL ADDRESS charleswatkins@ameritech.net | E-MAIL ADDRESS glennhara@ameritech.net |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 03122790 | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 6280159 |
| MEMBER OF TRIAL BAR? YES ☐ NO ☐ | MEMBER OF TRIAL BAR? YES ☐ NO ☐ |
| TRIAL ATTORNEY? YES ☐ NO ☐ | TRIAL ATTORNEY? YES ☐ NO ☐ |
| | DESIGNATED AS LOCAL COUNSEL? YES ☐ NO ☐ |

| (C) | (D) |
|---|---|
| SIGNATURE Matthew T. Heffner | SIGNATURE |
| NAME Matthew T. Heffner | NAME |
| FIRM Susman & Watkins | FIRM |
| STREET ADDRESS Two First National Plaza, Suite 600 | STREET ADDRESS |
| CITY/STATE/ZIP Chicago, Illinois 60603 | CITY/STATE/ZIP |
| TELEPHONE NUMBER (312) 346-3466 / FAX NUMBER (312) 346-2829 | TELEPHONE NUMBER / FAX NUMBER |
| E-MAIL ADDRESS mattheffner@ameritech.net | E-MAIL ADDRESS |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 6269925 | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) |
| MEMBER OF TRIAL BAR? YES ☐ NO ☐ | MEMBER OF TRIAL BAR? YES ☐ NO ☐ |
| TRIAL ATTORNEY? YES ☐ NO ☐ | TRIAL ATTORNEY? YES ☐ NO ☐ |
| DESIGNATED AS LOCAL COUNSEL? YES ☐ NO ☐ | DESIGNATED AS LOCAL COUNSEL? YES ☐ NO ☐ |

FILED 2004 NOV 24 PM 2: CLERK U.S. DISTRICT COURT